## WALLACE *v.* CENTRAL OF GEORGIA RAILWAY CO.

There was no material error in rejecting or in admitting testimony, but the error committed in directing a verdict requires a new trial. .

Argued July 9, — Decided August 8, 1902.

Case. Before Judge Reid. City court of Atlanta. January 11, 1902.

*Hoke Smith & H. C. Peeples,* for plaintiff.
*Dorsey, Brewster & Howell,* for defendant.

LUMPKIN, P. J. The plaintiff in error, Mrs. Josephine Wallace, brought against the Central of Georgia Railway Company an action for the homicide of her husband, which occurred on the 1st day of August, 1898. The undisputed facts of the case, as developed by the evidence, are substantially as follows: The deceased was an engineer in the service of the defendant, and was, at the time of his death, engaged in running the locomotive of an extra train which was operated between Atlanta and Hapeville. Between these points there were two main tracks, one of which was used for trains going out of the city and the other for trains coming into it. At McPherson station, looking towards Hapeville, the right-hand main track was the one for outgoing trains and the opposite main track was the one for incoming trains. Between these two main lines there was a middle track used for switching. A spur-track passed from the middle track and ran across the right-hand

main line into McPherson Barracks.   Eason was the conductor of
the train upon which Wallace was engineer.   On the morning of
the day on which 'the killing occurred, Eason, under the direc-
tion of the proper authority, had left a number of passenger-cars
to be loaded in the barracks with troops, and had gone to Hape-
ville, where he worked during the forenoon.   His orders were to
return to the barracks at one o'clock and carry the passenger-cars
containing the soldiers to Atlanta.   Eason's train reached McPher-
son on its return from Hapeville a few minutes after one o'clock.
A passenger-train, No. 33, was due to pass McPherson on the out-
going main line at fifteen minutes after one.   After reaching Mc-
Pherson on the incoming main line, Eason left a number of cars
upon it and then had the locomotive pulled further up this main line
and from it backed upon the middle track and coupled to several box-
cars which were standing thereon.   There the locomotive and these
cars remained till No. 33 had passed.   Eason then ordered Wallace
to back the box-cars attached to his locomotive across the outgo-
ing main line, and had these cars coupled to the passenger-cars
which had been left in the barracks.   After this coupling had been
made and the train had come to a standstill, a portion of the loco-
motive occupied the rails of the outgoing main line.   In this sit-
uation of affairs and while the soldiers were getting aboard the pas-
senger-cars, a freight train, known as No. 42, coming from Atlanta,
collided with the locomotive of Eason's train, and, as a result, Wal-
lace was killed.   Numerous rules of the company were introduced
in evidence.   Such of them as require special consideration will be
hereinafter noticed.   There was much conflict in the testimony as
to various matters other than those mentioned above; and after
both sides had closed, the court directed a verdict for the defend-
ant.   Mrs. Wallace made a motion for a new trial, which was over-
ruled, and she excepted.   We will first dispose of the minor points,
and then pass upon the main question, which is whether or not the
court erred in not submitting the case to the jury.

The plaintiff's counsel offered certain testimony to which coun-
sel for the defendant objected. · The court intimated that the tes-
timony was inadmissible, and after some discussion the counsel first
mentioned remarked to the court: " I will not insist upon it at the
present."   This was certainly sufficient to warrant the inference
that the offer to introduce this testimony was withdrawn, and the
judge certifies that this was his understanding of the matter.

It was on the trial below contended that the plaintiff's husband was, while engaged in switching and moving his train at McPherson, under the protection of certain rules of the company which provided for the operation of what is called the "Block System." Counsel for the company insisted that these particular rules were not applicable in such a case as the present. The plaintiff's counsel introduced testimony tending to show that, under a custom or practice which had prevailed, the "Block System" had been relied on for the protection of train crews while engaged in switching at stations within the territory covered by the system. To meet this the defendant's counsel were permitted to introduce, over objection, the testimony of several witnesses, who had been employed by the company in the running of trains, to the effect that so far as they knew no such custom or practice had ever prevailed. Some of this testimony was irrelevant, because it related to a period subsequent to the date of the homicide, and some of it was probably so because it related to a period long anterior to that date, when the rules of the company were not the same as those in force when Wallace was killed. The judge certifies that he ruled repeatedly and distinctly that "evidence of any custom subsequent to August, 1898, was inadmissible." With this restriction and the further qualification that it was not permissible to show what the custom was under different rules, the testimony in question was proper. The rules pertaining to the "Block System" were not luminously clear as to whether or not it was applicable to a situation like that involved in the case in hand. The plaintiff undertook to show that it was by some of the company's servants treated as being so, and the defendant was allowed to show that by others of them it was not so treated. As will appear before we conclude, this is not really a matter of much importance; for we will endeavor to show that the "Block System" does not cut a substantial figure in this case. The plaintiff also excepted to other rulings made by the court in admitting and in rejecting testimony. With these we will not undertake to deal specifically, for they are, in view of what we regard as the controlling issue upon which the case should be made to turn, of but trivial moment.

The action of the court in directing a verdict for the defendant can be sustained only upon the theory that, viewing the testimony and all legitimate inferences therefrom most favorably for

the plaintiff, she was not entitled to recover. As a reviewing court we must treat as established in her behalf every contention of fact insisted upon by her which the jury would have been warranted in sustaining. There was ample evidence to show negligence on the part of the defendant, and the real issue in controversy was whether or not the deceased was guilty of contributory negligence. If he was, his widow has no right of action. If he was not, she has. If the deceased relied exclusively upon the supposed protection afforded by the "Block System" as a justification for leaving his locomotive in its exposed condition upon the outgoing main line, he was negligent. One of the general rules of the company, No. 399, provides that "When a train stops or is delayed, under circumstances in which it may be overtaken by a following train, the flagman must go back immediately with danger-signals a sufficient distance to insure full protection. When recalled, he may return to his train, first placing two torpedoes on the rail, when the conditions require it. The front of the train must be protected in the same way, when necessary, by the fireman." General rule No. 402 reads as follows: "When it is necessary for a train on double track to cross over to the opposite track, a flagman must be sent out with danger-signals, as provided in Rule No. 399." Rule No. 10 in the Joint Time Table declares that "Flagmen will not, under any circumstances, depend upon the block signals to protect their trains, but must go back with signals, as required by the general rules." It will not do to say that this rule is binding upon flagmen only. It is, under other rules introduced in evidence but which need not be set forth, incumbent upon conductors to see to it that flagmen perform their duties; and, as has been seen, if the front of a train is exposed to danger, the fireman must act as flagman "when necessary." If, upon such a necessity arising, the fireman did not so act, and the engineer knew this to be so, he would surely be unwarranted in assuming that protection from threatened danger would come from some other source. Interpreting the special rule last quoted in the light of the others, its plain meaning is that no person connected with the running of a train has the right to rely absolutely for protection upon the "Block System." For this reason we have not deemed it necessary to go into further detail as to what the record discloses with regard to the nature of this system, or to discuss the particular rules relat-

ing to it; and for the same reason, we now dismiss it from further consideration.

Under the rules above copied and others in evidence regulating the duties of conductors and engineers, the contents of which are not here essential, it was the duty of Eason, before placing his train in the position it occupied when the collision took place, to send a flagman towards Atlanta to intercept train No. 42. It was the duty of Wallace, if he knew that the conductor had neglected to take this precaution, to send the fireman forward on this mission. Under such circumstances, it would have been "necessary" for the engineer to take this step. The evidence on these vital matters, taking it most favorably for the plaintiff and giving her the benefit of the strongest legitimate inferences which could be drawn therefrom in her favor, would have warranted a finding that Eason, before causing the box-cars to be backed into the barracks, did order Griggs, a flagman, to go forward and flag No. 42; that he started out as if to obey this order, and that Wallace was in a position where he could have heard and seen what occurred. In point of fact Griggs did not flag No. 42; and he, as a witness, denied having been ordered to do so at all. Indeed, we wish to state just here in the plainest terms that we are not undertaking to say what was the truth as to any feature of the case, or to intimate what the verdict should have been. The testimony was, as already stated, conflicting at every issuable point, and we are dealing with it merely from the standpoint that it was the plaintiff's right to have the jury pass upon her contentions and to obtain the benefit of that result which would properly ensue from their finding that the same were well founded in fact. If the truth was as above outlined, Wallace was not negligent in failing to send the fireman forward to flag No. 42. Whether, upon the assumption that he neither heard Eason order Griggs to flag that train nor saw Griggs make any movement towards doing so, he would have been negligent in not sending out the fireman, we do not now decide, but leave this question open for determination, if need be, at the next hearing.

Nor did the evidence demand a finding that Wallace was negligent in not himself looking towards Atlanta and discovering the approach of No. 42 in time to get his train out of its way. Nor were the jury by any means bound to find that Wallace was negligent in not backing far enough into the barracks to clear the main

line of his locomotive at the time the box-cars were coupled to the passenger-cars, or that it was his duty, after this coupling had been made, to then push the entire train further back into the barracks so as to leave the main line open. On all these and many other strenuously contested questions there was much oral testimony pro and con, and many pertinent rules of the company were introduced. We do not deem it essential to enter upon a detailed discussion of these various matters. Enough has been said, we think, to enable the clear-headed and most capable judge of the trial court to apprehend upon what lines the case should be submitted to the jury, and we are quite confident that he will do so in the able and satisfactory manner with which he usually conducts the business of his court.

*Judgment reversed. All the Justices concurring, except Lewis, J., absent.*